## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN SOUTHERN DIVISION

**JENNIFER M. HEARD & ANDRÉA MACKAHAN**

     *Plaintiffs,*       Case No.

                Hon.

   —*vs*—

**THE CITY OF HIGHLAND PARK**

 a Municipal Corporation,

     *Defendant.*

_____

### PLAINTIFFS' COMPLAINT &
### <u>DEMAND FOR TRIAL BY JURY</u>

   NOW COME the Plaintiffs, Jennifer M. Heard and Andrea Mckahan by and through their attorney Robin H. Kyle, complaining against the Defendant City of Highland Park, as follows:

### PARTIES

   **1.**  Plaintiff Jennifer M. Heard, was at all relevant times herein alleged an individual who resided in the city of Westland, Michigan, County of Wayne and State of Michigan.  The Plaintiff is a current employee of the Defendant City of Highland Park Police Department, with a hire date of December 2017**.** Plaintiff was hired by the Highland Park Police Department with the rank of Officer.

2.     Plaintiff Andrea McKahan, was at all relevant times herein alleged an individual who resided in the city of South Lyon, County of Wayne and State of Michigan.  The Plaintiff is a former employee of the Defendant City of Highland Park Police Department, with a hire date of August 25, 2019**.**  Plaintiff was hired by the Highland Park Police Department with the rank of Officer.

3.      Defendant City of Highland Park is, and at all times herein alleged was a Michigan municipal corporation, organized and existing under and by virtue of the laws of the State of Michigan and with principal offices in the city of Highland Park County of Wayne and State of Michigan.

## JURISDICTION

4.     This matter is properly within the jurisdiction and venue of The United States District Court for the Eastern District of Michigan, Southern Division.  This action involves a claim arising under the United States Constitution and laws of the United States.  This action involves *inter-alia*, claims under 42 U.S.C. §1983, and an alleged deprivation of Plaintiff's constitutional rights to Free Speech, Liberty and Property under the First and Fourteenth Amendments of the United States Constitution.  This Court is therefore vested with proper subject matter jurisdiction pursuant to 28 USC §1433(a)(3).

## GENERAL ALLEFGATIONS

**5.**      Plaintiffs at all relevant times had liberty and property interest in their positions as police officers with the Defendant's Police Department.  Those interest are protected by the Due Process Clause of the Fourteenth Amendment of the United States Constitution, to wit: Plaintiff's choice of career and occupation. *See Wilkerson v. Johnson,* 699 F.2d 325, 328 (6th Cir. 1983) ("Liberty and property interests are intricately related in our system of political economy, a system based on free choice of careers and occupations, private property, and the right to compete.").

**6.**      Plaintiffs were deprived of their protected interest by Defendant when Defendant made Plaintiffs' working environment hostile, and imposed disparate working conditions on Plaintiffs, thereby discriminating against Plaintiffs based upon their sex as a female and their race as Caucasians.

**7.**      Defendant did not afford Plaintiffs any adequate procedural rights prior to depriving Plaintiffs of their liberty and property interest protected by the U. S. Constitution. In any event the deprivations were completely unconstitutional as no amount of process would have been adequate for the Defendant to legally implement the hostile, and disparate working conditions on Plaintiffs as herein alleged.  *See Hahn v. Star Bank,* 190 F.3d 708, 716 (6th Cir. 1999).

**8.**     Plaintiffs' rights under the Fourteenth Amendment guarantee of `due process of law' were violated by Defendant when Defendant infringed upon Plaintiffs' fundamental' liberty interests in their continued employment in a non-hostile working environment as Caucasian female police officers in Defendant's police department.

**9.**     The Sixth Circuit "has recognized that the Constitution protects a person's choice of careers and occupations." *Women's Medical Professional Corp. v. Baird, 483 F. 3d 595, 612* (6th Cir. 2006) (citing *Wilkerson v. Johnson, 699 F. 2d 325,* (6th Cir. 1983) ("Liberty and property interests are intricately related in our system of political economy, a system based on free choice of careers and occupations, private property, and the right to compete."[1]

**10.**     Plaintiffs at all relevant times had "the right to be free from" [Defendant's unauthorized] harassment actions which substantially impaired

---

[1]    Other courts have also held that a person has a property interest in continued operation of a business. See *United States v. Tropiano*, 418 F. 2d 1069, 1076 (2d Cir 1969 ("The right to pursue a lawful business . . . has long been recognized as a property right within the protection of the Fifth and Fourteenth Amendments of the Constitution."); *Small v. United States,* 333 F. 2d 702   (3d Cir. 1964) ("The right to pursue a lawful business or occupation is a right of property which the law protects against intentional and unjustifiable interference.").

Plaintiffs' freedom and property interest in their continued public employment,
free of a racially and sexually hostile and discriminatory working environment

**11.**     At all times herein-alleged Defendant acted under color of state law.
The conduct and constitutional violations herein alleged under 42 U.S.C. §1983,
are substantive due process violations based on official conduct which shocks the
conscience and "may not take place no matter what procedural protections
accompany them." *Wilson v.Beebe* 770 F.2d 578, 587 (6th Cir. 1985).

**12.**     Defendant's conduct deprived Plaintiffs of rights secured under
federal law. See *Handy-Clay v City of Memphis*, 695 F. 3d 531, 539 (6th Cir
2012) ) citing *Friz v Charter Twp of Comstock*, 592 F. 3d 718, 722 (6th Cir
2010)).

**13.**      Plaintiffs at all relevant times herein alleged were engaged in
constitutionally protected conduct.

**14.**     Defendant at all relevant times engaged in discriminatory conduct
imposing adverse employment actions against Plaintiffs that would deter an
average person of ordinary firmness from continuing to engage in the
constitutionally protected employment of which Plaintiffs were engaged.

**15.**     The adverse actions taken by Defendant were motivated at least in
part by Plaintiffs' sex as females and race as a Caucasian females.  The

discriminatory treatment based upon sex and race was severe, pervasive conduct constituting a hostile and dangerous working environment.

16. Defendant violated Plaintiffs' constitutional rights to a nondiscriminatory work environment against Caucasian female officers.

17. The constitutional rights violated by Defendant as herein alleged were clearly established at the time of Defendant's wrongful acts.

18. Defendant was not engaged in a discretionary function when it committed the discriminatory acts alleged herein violating Plaintiffs' constitutional and statutory rights. The working conditions for Plaintiffs implemented by Defendant were "sufficiently severe or pervasive to alter and did in fact alter the conditions of Plaintiffs' employment.

19. As Caucasian females Plaintiffs are members of a protected class and were subjected to the disparate and adverse employment conditions of *inter-alia*, being subjected being sent on dangerous radio runs without receiving available back up and/or being subjected to random drug testing and being subjected to frivolous Internal Affairs (IA) investigations.

20. Defendant's alteration of the working environment and the terms and conditions of Plaintiffs' employment created a discriminatory, abusive and dangerous working environment for Plaintiffs.

21.     Defendant deliberately made Plaintiffs' working conditions intolerable on the basis of Plaintiff's race and sex, in an attempt to force Plaintiffs to quit their jobs.

22.     The working conditions implemented by Defendant (including deliberately refusing to provide backup on dangerous radio runs) were and are so unbearable and dangerous that a reasonable person in Plaintiffs' position would be compelled to resign.

23.     Defendant's actions and inactions made it clear Plaintiffs were not welcome to continue working for Defendant on the basis of being a Caucasian female.  A reasonable person in Plaintiffs' positions would have had no choice but to resign for their own safety.

24.     Defendant knowingly used a supervisor who personally participated in constitutional violations against Plaintiffs and there is a causal connection between actions of Plaintiffs' supervisor and the constitutional deprivations herein alleged.

25.     Any reasonable officials occupying Defendant's positions would have known that the actions of Defendant's supervisory personnel were unlawful and would have taken prompt investigative and corrective action, which Defendant knowingly refused to take.

26.     Defendant municipality was acting "under color of state law" at the time it committed the conduct and inaction complained of herein, and as herein alleged Defendant's conduct deprived Plaintiffs of their "`rights, privileges and immunities secured by the Constitution or laws of the United State and the laws of the State of Michigan.

27.      Defendant at all times herein alleged was exercising power "`possessed by virtue of state law and made possible only because the wrongdoer" Defendant was clothed with the authority of state law as a municipality and Defendant was therefore acting under color of state law.

28.     There was not and is not any legitimate *bona fide*, non-discriminatory business reason for the discriminatory employment practices alleged herein.

29.     Defendant's decision to adopt a particular course of action against Plaintiff was made and implemented by the Defendant's Mayor, chief of police, deputy chief of police and others who establishes municipal, governmental policy in Defendant's police department.

30.     Defendant is therefore liable for the decisions and policies of its Mayor, police chief and deputy chief of police, whether the actions taken by the police department were to be taken against Plaintiffs only once or taken repeatedly, as in this case.

**DEFENDANT'S MUNICIPAL DECISION, POLICY CUSTOM & PRACTICE**

**31.**     Pursuant to the Defendant's city charter Defendant's mayor, police chief and deputy chief (both appointed by the mayor) are, the final decision makers respecting policy in Defendant's police department and the day-to-day operations, including all hiring, firing, promotion and discipline in the HPPD, including job assignments in the department as well as hiring and firing of the police chief, the deputy chief and all police officers.

**32.**     Defendant's mayor is the official who is legally responsible for establishing Defendant's final governmental policy and decisions respecting the hiring, firing, working conditions, promotion, placement, and discipline of police officers.[2]

**33.**     Defendant made a deliberate choice and decision to follow a specific course of action of discriminatory working conditions for Plaintiffs based upon their status as female Caucasians.

**34.**     The Defendant's actions of its police chief and deputy police chief are unquestionably acts of official Defendant government policy and decisions

---

[2] In *Pembaur v. Cincinnati*, 475 U.S. 469, 470 FN11(1986), the Supreme Court held "a policy authorizing an unconstitutional act can be established by a single decision by proper municipal policymakers."

that are actions of the Defendant municipality in the context of the operations of Defendant's police department.

**35.**     The actions of the Defendant's police chief and deputy chief pertaining to Defendant's police department are "edicts or acts [that] may fairly be said to represent [Defendant's] official policy" and have inflicted Plaintiffs' injuries, which makes Defendant municipality liable under 42 U.S.C. §1983.

**36.**     Defendant's policy is premised upon the decisions which ordered or authorized an unconstitutional act and which may be established by a single decision by the  mayor, police chief or deputy chief whom are the proper municipal policymakers.

**37.**     Defendant has purposefully caused a constitutional tort through the decisions of its police chief and deputy chief, whom are appointed by the Mayor and given the authority to make the final municipal decisions for Defendant regarding Defendant's police department, pursuant to the city charter and state law.

## FACTUAL BACKGROUND.

### Random Drug Testing

**38.**     Male African American and male Caucasian employees of Defendant's Police Department were not subjected to random drug testing.

**39.**    Defendant's implementation of random drug testing for Caucasian females but not for African American males or Caucasian males constitutes a racially and sexually hostile working condition and a hostile working environment.  This working condition and environment is a discriminatory and unconstitutional term or condition of public employment, that is proscribed under both state and federal law and is remediable under 42 U.S.C. §1983.

**40.**    Sex and race were motivating factors for the discriminatory employment practices herein alleged.

**41.**    Plaintiffs are employed by Defendant under a Collective Bargaining Agreement however the CBA does not authorize random drug testing for either men or women.  Nevertheless, the Defendant has implemented its discriminatory practice of randomly selecting female employees and only female employees for random drug testing.

**42.**    On or about December 2, 2019, Plaintiff was advised by Defendant's Human Resource Director Rasheka Christvan that she (Plaintiff) had been randomly selected to undergo random drug screening at Concentra, a medical facility utilized by Defendant.

**43.**    Upon information and belief Defendant did not and has not historically required Caucasian male officers or African American male officers to submit to random drug testing.

**44.** Plaintiff Jennifer Heard and another Caucasian female Sgt Heather Holcomb were the only members of the Highland Park Police Department ordered to undergo random drug testing.

**45.** Plaintiff Jennifer Heard and Caucasian female Sgt Heather Holcomb were both required to submit urine samples and were the only members of the HPPD required to submit urine samples.

**46.** Plaintiff Jennifer Heard and Sgt Holcomb were therefore humiliated and degraded by Defendant in front of their contemporaries and fellow department members based upon their race and sex.

**47.** Plaintiff Jennifer Heard and Sgt Heather Holcomb complained about the drug testing and were advised that they had no choice and refusing the random drug testing would costs them their jobs.

**48.** Male officers are not subjected to "Random" drug testing or "drug screening" and the practice of random drug testing is limited by Defendant to female officers.

**49.** Defendant's policy of randomly testing anyone is by definition arbitrary and as implemented by Defendant in this circumstance is also discriminatory based upon sex and race.

**50.**    Plaintiff Jennifer Heard and Sgt Heather  Holcomb, were both subjected to sexually and racially discriminatory random drug testing on or about December 2, 2019.

## Caucasian Female Officers Not
## Allowed To Transport Suspects

**51.**    Plaintiff and another Caucasian female officer have been told by supervisors that females cannot be involved in the transportation of prisoners or detainees because they are females.

**52.**    Plaintiff Andréa Mckahan was never allowed to transport a prisoner via, ambulance, but was not told why.

**53.**    Cpl. G. John was the OIC (officer in charge) on May22, 2018, and on that date at approximately 0050 hours, Plaintiff Heard and another female Officer were dispatched to 74 Monterey for a" violent mental damaging property at the location."

**54.**    On the aforesaid date Plaintiff and another female officer Carrio responded to the radio run and the female officers were able to detain the subject and place him into handcuffs. The subject detainee was later placed into the rear of Rapid Response unit 927 for transport to the hospital.

**55.**    Also on the aforementioned date, and due to the suspect's violent nature female medics requested the handcuffs stay on the detainee mental patient

and an officer also ride with the medics to the hospital to avoid any safety issues during transport.

**56.**    Corporal G. John (hereinafter Corporal John) who was the OIC made statements regarding not utilizing Officer Heard and Officer Carrio (2-man unit) because they were "females."  Corporal John instead directed a male officer (Officer Richmond), (a single man unit) to follow the ambulance to the hospital with no officer riding with the medics, posing a threat to the medics and the detainee.

**57.**    Anna Domanski who was the second Rapid Response personnel requested of Corporal John that "following" was not going to work, due to the violent demeanor of the mental patient detainee.

**58.**    Corporal John's actions were obviously prejudiced and discriminatory and based upon Plaintiff Heard's and officer Carrio's status as female officers.

**59.**    Both Plaintiff Heard and officer Carrio were indeed qualified to perform the job of assisting the medics in the transportation of the detainee mental patient, as demonstrated by their successful efforts to handcuff the detainee and secure him in the ambulance.

**60.**    During the incident Corporal John approached Plaintiff's patrol vehicle. Plaintiff Heard mentioned to Corporal John that Officer Carrio could ride

in the ambulance and Officer Heard could follow in the patrol vehicle. Corporal John replied "no, I need a guy to go" and (a male officer) Richmond was then selected to follow the ambulance with no officer on board the EMS vehicle to protect EMS technicians, whom had already requested an officer ride in the ambulance.

61.     Plaintiff Heard and officer Carrio were demeaned and disrespected when corporal John made the sexist and discriminatory comment toward them as female officers and female officers generally.

62.     Both Officers Carrio and Plaintiff Heard had ridden with EMS on prior radio runs to provide security and were clearly qualified and capable of performing the task of providing security for the EMS technicians in transporting a potentially dangerous detainee.

63.      There was no bona fide legitimate business reason for the sexually discriminatory conduct by supervisor and OIC, Corporal John.

64.     On May 26, 2018, Officer Heard spoke with Corporal Ochs and complained about the discriminatory treatment and that she felt Corporal John's behavior and statements to be demeaning, disrespectful, sexually discriminatory, and inappropriate.

65.     At the time of the incident Plaintiff Heard told Corporal John that she was offended by his conduct and statements, however the issue was never

properly investigated or addressed.  Corporal John was not disciplined and never

even offered an apology or explanation for his sexually discriminatory conduct.

66.   Corporal Ochs obtained a written statement from Corporal John via

E-mail on 05/25/18, who offered the following admission:

> . . . that he spoke with Officer Richmond telling him to
> follow Medics in case he became violent again. Corporal
> John states he told Richmond that he wanted a guy to go,
> meaning a [male] officer. Corporal John went on to say
> that he wanted an Officer, meaning Richmond, to go and
> wasn't trying to offend Officer Heard or Officer Carrio,
> or "make them feel any type of way".

67.   Some of the events of May 25, 2018, were captured on body cam

and corporal John can be heard saying: "let's keep the females together", and then

corporal John tells officer Richmond [a male officer] to follow Rapid Response to

the hospital.

68.   On the audio portion of the body cam, corporal John can be heard

saying: "No, I want a guy to go cause he acting-stupid, not trying to be sexist or

anything but."

69.   Officer Richmond was on the radio run and he spoke with Corporal

John about having Officer Heard and Officer Carrio split up, one on the rig with

EMS and one follow, since they were a "two-man unit."  Corporal John stated: he

"did not want to send the females."

**70.** Corporal John then told officer Richmond to follow EMS to the hospital and reiterated  "let's keep the females together."

**71.** Plaintiff Heard made a formal written complaint regarding this sexually discriminatory treatment and advised her superiors that her supervisor Corporal John made statements regarding not utilizing them (Officer Carrio and Heard) to assist Rapid Response during transport to the hospital because they were female.

**72.** Plaintiff Heard also spoke to Ofc. Richmond, who confirmed that he spoke to Cpl John and suggested that Plaintiff and Ofc Carrio should escort the mental patient with one of them riding in the EMS vehicle.  Cpl John's response was "I can't send them they are girls."

**73.** Defendant failed and neglected to properly investigate Plaintiff Heard's complaints regarding discriminatory treatment as herein alleged and likewise failed to take appropriate corrective or disciplinary action.

### Other Instances Of Discriminatory
### Working Conditions

**74.** On May 14, 2019, at approximately 6:50 am, Plaintiff Heard timely arrived for her scheduled shift.

**75.** As is customary Plaintiff asked the OIC, Corporal John what was her assignment for her shift.

**76.** Corporal John totally ignored Plaintiff.

**77.** While standing immediately next to Corporal John Plaintiff Heard asked: "what vehicle am I supposed to have?" Corporal John again completely ignored Plaintiff.

**78.** Plaintiff Heard next spoke with the supervisor for the day, Sgt. McMahon and advised him of the situation.

**79.** After hearing Plaintiff Heard's complaint to Sgt. McMahon, Corporal John got up from his computer and in a sarcastic tone stated: "Officer Heard you are 16-22 and vehicle 16-87". To which Plaintiff replied: "16-87 was taken by another officer" and that she didn't know which vehicles were working.

**80.** Corporal John then tossed a set of keys on the desk and said to Plaintiff Heard "find a car then". Plaintiff asked what vehicle the keys went to, and Corporal John ignored her.

**81.** Plaintiff Heard departed the station and encountered Sgt Holcomb. Plaintiff explained to Sgt Holcomb how upset she was by Corporal John's behavior and that she was the only officer who was not given a vehicle assignment for the day.

**82.** Sgt. Holcomb, Corporal John, and Plaintiff Heard then met to discuss corporal John's conduct. Corporal John insisted he did not hear Plaintiff addressing him and Plaintiff should have used his name.

83.    Corporal John had no explanation for why none of the other officers were required to say his name when asking for their patrol vehicle assignments. Nor could Corporal John explain why he had responded that day to all of the other male officers who requested vehicle assignments, without addressing him by name.[3]

84.    Corporal John's disparate treatment of Plaintiff was based upon her race and sex being Caucasian females.

### Discrimination Against Plaintiff Andrea Mckahan And Other Caucasian Females

85.    Other Caucasian female officers have been discriminated against by the same supervisor Corporal John.

86.    By way of example and not limitation, Corporal John would assign significantly more work to Caucasian female officers than he did to non-Caucasian officers or male officers.

87.    Specifically, Corporal John assigned Plaintiff Andréa McKahan to complete 24 reports while only requiring a male officer Funk (on the same shift as Plaintiff  McKahan) to complete just 14 reports for the same time frame.

---

[3]    As a matter of departmental policy all shift related questions (including vehicle assignments) are directed to the shift supervisor, in this case Corporal John.

88.    Additionally, Plaintiff Andréa McKahan was required to change from her shift with Corporal John due to not receiving backups she requested when she was responding to dangerous radio runs on her previous shift under the supervision of Corporal John.

89.    Corporal John repeatedly, unnecessarily and openly criticized Plaintiff McKahan's performance in front of complaining witnesses and the general public, while she was on an active dispatched call.  This working condition was also limited to Caucasian female officers.

90.    Plaintiff Andréa McKahan complained verbally and in writing to appropriate supervisory personnel of the sexist discriminatory conduct by Corporal John on, *inter-alia,* June 1, 2020; June 10, 2020; June 21, 2020; July 24, 2020; July 29, 2020; July 30, 2020; August 5, 2020; August 7, 2020; September 2, 2020; and September 4, 2020.

**Failure To Follow Back-Up
Protocol For Caucasian Female Officers**

91.    Contrary to official HPPD procedure, Corporal John and officer Funk repeatedly failed to communicate with Plaintiffs and other Caucasian female officers during radio-runs, jeopardizing the safety of the female officers. This working condition was likewise limited to Caucasian females.

92.     Corporal John and officer Funk would show up late or not show up at all when Caucasian female officers requested back-up on radio-runs and this working condition was limited to Caucasian females.

93.     Plaintiff has complained both verbally and in writing to Defendant regarding the serial failures to provide back-up, but Defendant has failed neglected and refused to investigate or take appropriate remedial action to address this dangerous discriminatory working condition.

**Priority Radio Run Stabbing Victim Failure To Provide Back Up**

94.     On or about June 30, 2020, Caucasian Plaintiff McKahan and Ofc Funk (male officer) both in separate vehicles, received a priority dispatch for a stabbing victim, in the vicinity of Woodward and Pilgrim.

95.     Plaintiff McKahan responded and dispatched immediately to the location and assumed Ofc Funk would follow immediately, however Ofc Funk did not follow or provide back up in a timely manner.

96.     When Plaintiff McKahan turned onto Pilgrim from Woodward, she could see someone bleeding in the middle of the road.

97.     Plaintiff McKahan decided to request Corporal John to provide back up, but Corporal John did not make the scene until after EMS had taken the victim to the hospital.

**98.** Plaintiff McKahan was forced to deal with: a stabbing victim who was abut to bleed out; a witness and possible suspect sitting on the curb holding a baby; very limited time to obtain identifying information; conduct weapons search; and trying to obtain coherent statements from witnesses, all without protocol back up.

**Domestic Violence Radio Run Failure To Provide Back Up**

**99.** On or about July 18, 2020, Plaintiff McKahan in a single patrol vehicle responded to a radio run regarding domestic violence, assault and battery.

**100.** Corporal John was supposed to provide back-up but was over 10 minutes late responding to the scene and when he finally did arrive he did not positioned himself in an area that would afford him a clear view for Plaintiff McKahan and Plaintiff Heards safety. This is a failure to provide back up and failure to follow proper police safety procedure regarding the safety of two female Caucasian officers.

**Vicious Dog Radio Run Failure To Provide Back Up**

**101.** On or about July 19, 2020, Plaintiff McKahan was dispatched regarding a vicious stray dog complaint. On this radio run Ocf. Funk failed to provide back-up and even after Ofc Funk finally arrived close to the scene, he stayed in his patrol vehicle a full block away on an unlit street for the entire duration of the radio run.

**102.**    Subsequently, that same day, Plaintiff McKahan received a follow-up dispatch indicating the vicious stray dog had returned.  Neither Ofc Funk nor anyone else ever arrived at the location to provide back-up.

**Second Domestic Violence Radio Run Failure To Provide Back Up**

**103.**    On or about the aforesaid date, Plaintiffs were also dispatched to a domestic violence in progress to which Corporal John also responded.  However, immediately after the DV run, Corporal John "disappeared" for the balance of the shift, requiring Plaintiffs to handle the balance of runs on the shift alone and without backup**.**

**Felonious Assault Radio Run Failure To Provide Back Up**

**104.**    On or about July 9, 2018, Plaintiff Heard was required to respond to a reported felonious assault in progress, without backup due to Corporal John's failure to timely respond.

**105.**    During the July 9, 2018, FA run, Plaintiff Heard encountered Corporal John who was at a traffic ticket stop.  Plaintiff informed Corporal John of the FA situation.

**106.**    Nevertheless, Corporal John did not provide back up and was so late arriving at the FA run, Dispatch had to summon DPD units to provide back up to Plaintiff Heard.  During this FA run, a loaded shotgun and an unloaded handgun

were recovered.

**Assault And Battery Radio Run Failure To Provide Back Up**

**107.**   On or about July 13, 2018, Plaintiff Heard responded to a radio run regarding an assault and battery in progress.  Plaintiff attempted to contact Corporal John four times and he failed to respond.

**108.**   District 3 Dispatch was then contacted and requested Rapid Response to the location.

**109.**   Corporal John answered on the radio three minutes later only after dispatch had tried multiple times unsuccessfully to reach him.  Corporal John was not monitoring on the administrative channel and he apparently had no clue Plaintiff Heard and others officers were on a run or what the location was.

**110.**   Defendant has received multiple written and verbal complaints regarding failure to provide back-up and follow safety protocol pertaining to female Caucasian officers and Defendant has failed and refused to properly investigate or take corrective action.

**Multiple Frivolous Investigations Against Plaintiffs**

**111.**   Plaintiffs have been subjected to numerous and completely frivolous investigations submitted to Plaintiffs' supervisors by a black male officer Aaron Haley, member of the HPPD and Corporal John.  The requested investigations

were submitted to discriminate against Plaintiffs based upon their race and sex as Caucasian females.

112.   These frivolous investigations were all based upon Plaintiffs' status as a Caucasian-females.  Plaintiffs,' complained about this situation verbally and in writing to their superiors, however Defendant did not investigate Plaintiffs' complaints or take any remedial actions to address the complaints.

113.   By way of example officer Aaron Haley made a frivolous complaint against Plaintiff regarding a radio run Plaintiff conducted.

114.   Aaron Haley complained to Plaintiff Heard's supervisor Sgt Dupius on May 21, 2020.

115.   Sgt Dupius investigated the complaint, reviewed the video of the officer's body cam and determined the complaint was totally without merit.

116.   Officer Aaron Haley made another frivolous complaint to Plaintiff Heard's supervisor on June 13, 2020, regarding a radio-run Plaintiff Heard handled.  Again, Sgt Dupius investigated the complaint, reviewed the video of the officer's body cam and determined the complaint was meritless.

**Frivolous Allegations of Failure To Investigate Rape**

117.   On or about April 16, 2019, Deputy Chief James Tolbert began investigating Plaintiff Heard in an attempt to place responsibility for an alleged

failure to investigate a rape on Plaintiff Heard.  Deputy Chief Tolbert alleged

Plaintiff Heard "failed to perform her due diligence."

**118.**    In actuality Deputy Chief Tolbert knew the victim claimed two black

male officers CPL John and RO Charles Lackey were responsible for the alleged

failure to investigate or even make a police report concerning the victim's

allegations of rape.

**119.**    The alleged rape and failure by the HPPD were covered on a FOX

local news broadcast.

**Frivolous Allegations Of "Failure To Act"**

**120.**    On or about September 3, 2020, Plaintiff McKahan was advised

verbally by Sergeant Holcomb and Ms. Akins that she (McKahan) was under

investigation for "failure to act."

**121.**    Plaintiff McKahan inquired of Sergeant Holcomb if he could provide

specifics concerning the allegation of "failure to act", such as who made the

allegation?  What was the allegation alleging Plaintiff McKahan failed to do? Is

there anything other than the date, location and title of the investigation, that

Sergeant Holcomb could provide to help Plaintiff McKahan understand the nature

of the allegation "failure to act."  The answer to these inquiries was "no."

**122.**   The so-called investigation against Plaintiff McKahan for "failure to act" was determined to be meritless.

**Frivolous Allegations Re: Plaintiff's Traffic Stops**

**123.**   Plaintiff received an email from IT (sic) Charles Lackey (another black male who apparently handles technology issues but also handles internal affairs ) on April 16 and 17, 2019, stating he [Lackey] had received a complaint against her (Plaintiff Heard) , regarding a traffic stop. Upon information and belief this statement was false.

**124.**   Subsequently Lackey told another HPPD member Detective Bartinski he (Lackey) was going to pull all of Plaintiff's data for all of Plaintiff's traffic stops she's ever done, and every radio run Plaintiff Heard has ever handled.

**125.**   Upon information and belief Lackey did so in a futile attempt to impugn Plaintiff Heard's qualifications based solely upon Plaintiff being a Caucasian female.

**Roll Call Incident May 17, 2020**

**126.**   During roll call on or about May 17, 2020,  Shift Corporal John made the discriminatory statement: "A certain female thinks that she can jump the ranks of command and tell me."

**127.** The May 17, 2020, statement was made in front of officers and reserve officers as part of the roll call for the shift and upon information and belief everyone knew Corporal John was referring to Plaintiff Heard who was one of only two Caucasian females that worked Corporal John's shift.

**128.** Upon information and belief Corporal John was retaliating against Plaintiff Heard for reporting instances of illegal discriminatory conduct by him and others.

**129.** On or about May 15, 2019, Plaintiff Heard was advised by Det Bartynski, that during a conversation he (Bartynski) had with Det Heaney and Det Menge regarding DC Tolbert, Bartynski discovered DC Tolbert was looking into a traffic stop Plaintiff Heard previously conducted on or about May 13, 2019, for a vehicle plate violation.

**130.** Deputy Chief Tolbert was shown the law by another detective and Plaintiff's stop was determined to be clearly proper and the "investigation" was concluded.

**131.** Upon information and belief, the May 13, 2019, "investigation" is the first and only "investigation" ever conducted by a deputy chief into any officer for issuing a ticket for a plate violation.

Upon information and belief, the May 13, 2019, so-called "investigation" was merely a pretext for discrimination and based upon Plaintiff Heard's status as a

Caucasian female.

**Bonus Pay Discrimination February 2021**

**132.**   In February of 2021, all of the Corporals in the HPPD were paid signing bonuses of $500.00 for signing of a new contract.

**133.**   All of the Corporals were paid the signing bonus of $500.00, except Plaintiff Heard.

**134.**   Plaintiff Heard made a formal written and also a verbal complaint about the discriminatory compensation practice in February of 2021, but as of February of 2022, Plaintiff Heard has not been paid her signing bonus by Defendant.

**The Taser Competitions**

**135.**   On or about January 25, 2022, Plaintiff Heard forwarded an email to her superior Lt McMahon complaining about a "taser competitions" being conducted by Officer Valdes, Corporal Sheets and Officer Zaarour while on duty with the citizens of Highland Park during arrests.

**136.**   In response to Plaintiff Heard's complaint, none of the officers involved was investigated or disciplined. Instead, Plaintiff Heard was subjected to a completely baseless investigation to be conducted by Corporal Sheets, who was one of the individuals engaged in the illegal "Taser Competitions," about which

Plaintiff had complained.

**Corporal John Frivolously Demeans Plaintiff**

**137.**   On or about May 19, 2020, Plaintiff Mackahan was dispatched to the location of 16540 Woodward, regarding a loiterer.

**138.**   Upon Plaintiff Mackahan arrival the loiterer had left the scene and Plaintiff Heard proceeded to interview the complainant store clerk regarding the incident.

**139.**   Shortly thereafter Corporal John arrived on the scene and immediately interrupted Plaintiff Mackahan's interview of the complaining witness, and began a hostile chastising of Plaintiff about waiting for Ofc Crouch for back up.

**140.**   The complaining witness later apologized to Plaintiff Mackahan for getting her in trouble with her boss.

**141.**   On or about July 9, 2020, Plaintiff Mackahan was dispatched for a well- being check at 99 Manchester, Apt 307.  Corporal John and RO Richardson arrived on the scene as back up.

**142.**   As Plaintiff Mackahan exited her PV, she was stopped by Corporal John who gratuitously chastised Plaintiff in front of a group of citizens, because Plaintiff had advised dispatch that Corporal John was assisting her with the call.

**143.**   On or about July 9, 2020, Plaintiff Mackahan was dispatched to 391 Monterey, for officer safety and to assist Ofc Funk with a Home Invasion 1 call.

**144.**   After the Home Invasion call was resolved, Corporal John re-started his chastisement about the previous 99 Manchester call.  Because of their being on a dark street with citizens in hearing range, Corporal John agreed to discontinue his gratuitous mean spirited lecture until they returned to the station.

**145.**   Upon return to the station Plaintiff Mackahan advised Corporal John that she had already had a discussion with him regarding his unnecessary lectures in front of members of the public which Plaintiff Mackahan considered highly unprofessional.

## COUNT I  42 U.S.C. § 1981

**146.**   Plaintiffs hereby realleges each and every allegation contained in paragraphs one through one hundred and forty-five as if fully restated herein.

**147.**   By virtue of the premises herein alleged the Defendant is guilty of violating Plaintiffs' rights under 42 U.S.C. § 1981, to make and enforce contracts, and to the full and equal benefit of all laws and proceedings, as is enjoyed by white citizens including "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.  Defendant is liable to Plaintiffs for damages, therefore.

## RELIEF

Wherefore, Plaintiff s respectfully pray that this Honorable Court will enter judgment in Plaintiffs' favor and against Defendant for whatever sum of money in excess of $1,000,000.00 to which Plaintiffs are found to be lawfully entitled plus  awarding Plaintiff costs, attorney fees, equitable relief, punitive damages and whatever other relief, to which Plaintiffs are lawfully and/or equitably entitled.

## COUNT II  42 U.S.C. §1983 HOSTILE WORKINNG ENVIORNMENT

**148.**   Plaintiff hereby realleges each and every allegation contained in paragraphs one through one hundred and forty-seven as if fully restated herein.

**149.**   The hostile working environment as herein alleged was based upon Plaintiffs' sex and race and was severe and frequent.  The hostile working environment as herein alleged was based upon Plaintiffs' sex and race and was physically threatening.  See Failure To Follow Back-Up Protocol For Caucasian Female Officers ¶¶ 91-110; Stabbing Victim Radio Run ¶¶ 92-93; Domestic Violence Radio Run ¶¶ 94-95; Vicious Dog Radio Run ¶ 96; Second Domestic Violence Radio Run ¶ 97; Felonious Assault Radio Run ¶¶ 98-100; Assault And Battery Radio Run ¶¶ 101-104; Roll Call Incident May 17, 2020, ¶¶120-126.

**150.**   The Defendant's discriminatory hostile work environment herein alleged was also humiliating.  See. **Caucasian Female Officers Not Allowed To Transport Suspects** ¶ ¶ 51-73, also see ¶ 87, Caucasian Females Assigned More Work.

**151.**   The Defendant's discriminatory hostile work environment herein alleged unreasonably interfered with Plaintiffs' work performance. Id.

**152.**   The Defendant's discriminatory hostile work environment herein alleged amount to discriminatory changes in the terms and conditions of Plaintiffs' employment.  Id.

**153.**   By virtue of the premises herein alleged the Defendant is guilty of violating Plaintiffs' constitutional rights as herein alleged and is liable for damages therefore under 42 U.S.C. § 1983.

**154.**   The facts as herein alleged establish facts demonstrating, the deprivation of Plaintiffs' rights secured by the Constitution and laws of the United States and were caused by a person acting under the color of state law. *Marvin v. City of Taylor*, 509 F.3d 234, 243 (6th Cir.2007) (quoting *Sigley v. City of Parma Heights*, 437 F.3d 527, 533 (6th Cir.2006))

**155.**   The Plaintiffs' rights secured by the constitution and addressable under 42 U.S.C. § 1983, that were violated by Defendant include: Plaintiffs' fundamental' liberty interests in their continued public employment in a non-

hostile working environment and without being subjected to discriminatory, dangerous working conditions as Caucasian female police officers in Defendant's police department.

156.    The Plaintiffs' rights secured by the Constitution and state law (redressable under 42 U.S.C. §1983), and knowingly violated by Defendant also include Plaintiff's rights to the same working conditions as is enjoyed by their African American male and Caucasian male counterparts and without Defendant severely and pervasively altering the conditions of Plaintiffs' employment.

157.    The Plaintiffs' rights secured by the constitution and redressable pursuant to 42 U.S.C. §1983, and knowingly violated by Defendant further includes the severe and pervasive implementation and tolerating of a discriminatory, dangerous and abusive working environment for Plaintiffs on the basis of their race and sex as Caucasian females.

158.    The Plaintiff's rights secured under state law and by the U.S. Constitution and remedies provided under 42 U.S.C. §1983, and knowingly violated by Defendant further includes Plaintiff's right to notice and procedural due process before the Defendant implemented the adverse, discriminatory working conditions identified herein against Plaintiffs.

159.    However, no procedural due process would have been constitutionally adequate for the implementation of the adverse, discriminatory

working conditions herein alleged.

## RELIEF

Wherefore, Plaintiffs respectfully pray that this Honorable Court will enter judgment in Plaintiffs' favor and against Defendant for whatever sum of money in excess of $1,000,000.00 to which Plaintiffs are found to be lawfully entitled plus awarding Plaintiff costs, attorney fees, equitable relief, punitive damages and whatever other relief, to which Plaintiffs are lawfully and/or equitably entitled.

## COUNT III

### UNCONSTITUTIONAL SEZURE
### VIOLATION OF FOURTH AMENDMENT

**160.**   Plaintiff Heard hereby realleges each and every allegation contained in paragraphs thirty-eight through fifty as if fully restated herein.

**161.**   By virtue of the premises herein alleged the Defendant is guilty of violating Plaintiff Heard's constitutional rights under the Fourth Amendment to be free from unreasonable seizure, by ordering only Caucasian females such as Plaintiff Heard to undergo random drug testing, while not requiring such random drug testing for African American male employees or Caucasian male employees.

**162.**   The drug tests at issue here are attributable to government or government-sanctioned action in-as-much as Defendant is a municipality and Defendant's employees are employed by municipal government.

**163.**   It is well settled that drug tests, which utilize blood-testing, breath-testing or urinalysis, constitute "searches" that come within the ambit of the Fourth Amendment. *Skinner*, 489 U.S. 602, 616-617, 109 S.Ct. 1402, 103 L.Ed.2d 639 (citing *Schmerber v. California*, 384 U.S. 757, 767-768, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966), (finding a Fourth Amendment search in the use of blood-testing procedures); *California v. Trombetta*, 467 U.S. 479, 481, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984) (finding a Fourth Amendment search in the use of breathalyzers)).

**164.**   Plaintiff Heard's constitutional right to be free from unreasonable seizures as herein alleged was clearly established and known to the Defendant at the time of Defendant's illegal seizure.

## RELIEF

Wherefore, Plaintiff  Heard respectfully prays that this Honorable Court will enter  judgment in Plaintiff's favor and against Defendant for whatever sum of money in excess of $1,000,000.00 to which Plaintiff Heard is found to be lawfully entitled plus  awarding costs, attorney fees, equitable relief, punitive damages and whatever other relief, to which Plaintiff is lawfully and/or equitably entitled.

## COUNT IV

## UNCONSTITUTIONAL SEARCH
## VIOLATION OF FOURTH AMENDMENT

**165.**   Plaintiff Heard hereby realleges each-and-every allegation contained in paragraphs thirty-eight through fifty as if fully restated herein.

**166.**   By virtue of the premises herein alleged the Defendant is guilty of violating Plaintiff Heard's constitutional rights under the Fourth Amendment to be free from unreasonable searches by ordering Plaintiff Heard to submit her urine and undergo random drug testing as alleged herein, while not requiring such random drug testing for African American male employees or Caucasian male employees.

**167.**   Even if this Court does not find that random drug testing of police officers is generally unconstitutional *per se*, the Court should nevertheless conclude Defendant's "random drug testing policy," in this case is absolutely unconstitutional because it lacks proper notice and is unreasonably and arbitrarily implemented and limited based upon race and/or gender.  Such a policy and practice as alleged herein are simply not constitutional.

**168.**   The collective bargaining unit applicable to Plaintiffs does not authorize random drug testing and neither Plaintiff Heard nor her union have agreed or consented to a random drug testing policy.

**169.**   Defendant's random drug testing of only Caucasian female

employees or just female employees is a totally unwarranted, unreasonable,

arbitrary policy, not supported "by the level of regulation of their [Plaintiff's]

job," not supported by a reasonable finding of suspicion, nor supported  "by the

nature of the work itself" (limited to Caucasian female Police officers only) and

does not outweigh Plaintiff Heard's privacy interest and her interest in being

employed in a non-disparate and non-discriminatory condition of employment.

Defendant's employment policy is therefore unconstitutional.

170.   Prior to Defendant's drug testing policy applied against only

females, the Defendant had a drug testing policy limited to: pre-employment,

post-accident, fitness for duty, follow-up and reasonable suspicion testing.  These

are the only mentions of drug testing in Defendant's employment manuals or

written documents and procedures.

171.   There is no mention of "random drug screening" or "random drug

testing" in Defendant's written documents pertaining to employment of police

officers.

172.   The Defendant's current policy is not in writing, lacks clarity and

does not give Caucasian female officers reasonable and adequate notice of what is

being tested and the Policy is implemented in such a way that it unreasonably

intrudes on the privacy of female officers and is unconstitutional.

173.   A compelled urine test from a governmental employee is a search for

purposes of the "unreasonable searches and seizures" clause of the Fourth Amendment. *Skinner v. Ry. Labor Executives Ass'n,* 489 U.S. 602, 617 (1989)..

174.   The search and seizure in this case are completely arbitrary, sexually discriminatory, capricious, non-business related, not compelled or necessitated by the nature of Plaintiff Heard's employment and is unconstitutional.

175.   The Fourth Amendment to the United States Constitution, is made applicable to the states through the Due Process Clause of the Fourteenth Amendment, *Mapp v. Ohio*, 367 U.S. 643, 655 (1961), and provides, in relevant part, that "[t]he right of the people to be secure in their persons . . . against unreasonable searches and seizure shall not be violated [.]" U.S. Const. amend. IV.

176.   Plaintiff Heard's constitutional right to be free from unreasonable searches as herein alleged was clearly established and known to the Defendant at the time of Defendant's illegal search and seizure.

## **RELIEF**

Wherefore, Plaintiff Heard respectfully prays that this Honorable Court will enter  judgment in Plaintiff's favor and against Defendant for whatever sum of money in excess of $1,000,000.00 to which Plaintiff is found to be lawfully entitled plus  awarding Plaintiff costs, attorney fees, equitable relief, punitive damages and whatever other relief, to which Plaintiff is lawfully and/or equitably

entitled.

February 17, 2022

Respectfully submitted,

By:     /s/ Robin H. Kyle
        Robin H. Kyle (P-33330)
        Attorney for Plaintiffs
        1701 Balmoral Dr
        Detroit, Michigan 48203
        Office:313-826-0155
        Cell: 313-492-2691
        robinhkyle@comcast.net

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN SOUTHERN DIVISION

**JENNIFER M. HEARD & ANDRÉA MCKAHAN**

    *Plaintiffs,*                                     Case No.
                                                       Hon.

v

**THE CITY OF HIGHLAND PARK**,

        a Municipal Corporation,

    *Defendant.*

_____/

### JURY DEMAND

Now Come the Plaintiffs, Jennifer M. Heard and Andrea McKahan by and through their attorney Robin H. Kyle and hereby demand a trial by jury in the above captioned matter.

February 17, 2022

                             Respectfully submitted,

                       By:      /s/ Robin H. Kyle
                             Robin H. Kyle (P-33330)
                             Attorney for Plaintiffs
                             1701 Balmoral Dr
                             Detroit, Michigan 48203
                             Office 313-826-0155
                             Cell  313-492-2691
                             robinhkyle@comcast.net